Lincoln Building Services Inc., Plaintiff,

against
Dellwood Development, Ltd. AND DEMETRIOS DELENGOS, Defendants.

Lincoln Building Services Inc., Plaintiff,
against
Dellwood Development, Ltd., Defendant.

5899/12

For Plaintiff
David Bolton, Esq.
Garden City, New York 11530
For Defendant
George G. Coffinas, Esq.
New City, New York 10956


Timothy J. Dufficy, J.

A joint trial of the above-captioned cases was held before this Court, on October 3, 2016, October 4, 2016, October 5, 2016, October 6, 2016, October 7, 2016, October 10, 2016, October 11, October 13, October 14, October 17, October 19, October 20, and October 21, 2016. As this was a bench trial, the Court was both the finder of facts and the determiner of questions of law. The Court considered the testimony of the witnesses, gave weight to that testimony, and generally determined the reliability of the witnesses' testimony (See Horsford v Bacott, 32 AD3d 310, 312 [1st Dept. 2006]). The Court also considered the interest or lack of interest in the case and the bias or prejudice of the witnesses (See People v Ferguson, 178 AD2d 149 [1st Dept. 1991).  Having reviewed the parties' submissions and upon refection of the evidence submitted at trial, the Court renders the following Findings of Fact and Conclusions of Law. 
FINDINGS OF FACT
In the action, under Index No. 5899/12 (action number one), plaintiff Lincoln Building Services Inc. asserts the following causes of action in its Second Amended Verified Complaint against defendants Dellwood Development, LLC and Demetrios Delengos: breach of contract based upon a promissory note, dated May 30, 2007, (first cause of action); breach of contract based upon a promissory note, dated June 5, 2007 (second); costs and attorneys' fees based upon the promissory notes (third); unjust enrichment (fourth); implied-in-fact contract (fifth); quantum meruit (sixth); breach of implied covenant of good faith and fair dealing (seventh); conversion (eighth); piercing the corporate veil (ninth); and fraud (tenth). In the other action, under Index No. 705630/15 (action number two), plaintiff Lincoln asserts a single cause of action for breach of contract based upon the promissory note, dated May 30, 2007. Both cases were consolidated for purposes of joint trial.
Plaintiff Lincoln Building Services Inc. (Lincoln) is a New York Corporation whose sole shareholder, director and officer is Vasilios Tsimitras (Tsimitras). In 2005, Lincoln was formed for the purpose of entering into the subject transactions. Mr. Tsimitras has own construction company, since approximately 1987. He is also a convicted felon, having pled guilty to grand larceny, in 2006, in connection with a public contract with the New Your State Office of General Services. As a result of that conviction, he was disqualified from obtaining public contracts for a period of five years. He also acted as a private moneylender. He would make his loans in the name of others, usually his niece, Pipitsa Vasilopoulou.
Defendant Dellwood Development, LLC (Dellwood) is a New York limited liability company formed in 2003. From the time of its formation until October 31, 2007, it sole member was Ovad Porat (Porat). Dellwood is engaged in the business of general construction. Its work was almost exclusively limited to the renovation of existing apartment buildings for conversion from low income rental units to condominium units to be purchased by their existing tenants. Dellwood had been contracted for this work by two not for profit entities - SHUHAB Housing Development Fund Corporation (SHUHAB) and UHAB Housing Development Fund Corporation (UHAB). The contracts were managed by the New York City Department of Housing Preservation and Development. Financing was provided by Community Preservation Corp. (CPC), later acquired by the Bank of America.
The contracts that Dellwood had with SHUHAB and UHAB required cash collateral accounts with CPC and the Bank of America. The purpose of the cash collateral account was to provide a source of funds for completion of projects in the event that Dellwood defaulted under the contracts. Cash collateral, in the amount of 10% of the contract price, was required. The funding of the cash collateral account was a condition precedent to being awarded each contract. At the conclusion of each job, assuming there were no defaults on the part of Dellwood, the cash collateral would be returned to Dellwood.
Porat sought to obtain the needed funds for the cash collateral from Simitras at some point in early 2004, because the contracts were lucrative, but Porat did not have the money for the cash collateral. Porat told some each was he needed about $2.5 million for the cash collateral.
In 2005, Lincoln and Dellwood signed a document purporting to be a partnership agreement. However, none of the formalities of a partnership ever transpired between the entities. Hence, the partnership never commenced. Rather, in 2005, Lincoln loaned the sum of $2,580,721 to Dellwood, which was owned at the time by Porat. The loan was made to enable Dellwood to pursue construction contracts worth approximately $24 million by providing security in the nature of cash collateral which Dellwood needed to deposit in order to obtain the public contracts. Before the loan was made Lincoln advised Dellwood that it would need to borrow the money, which Lincoln would, in turn, lend to Dellwood. In consideration for the loan, Dellwood agreed to repay to Lincoln the monies Lincoln loaned, plus the expenses Lincoln incurred to obtain the funds loaned, plus interest at the same rate that Lincoln paid for the monies it borrowed, plus the sum of $1 million, which was to be Lincoln's compensation for making the loan. Dellwood made some of the monthly payments to Dellwood on the loan. Lincoln used the monies Dellwood paid to Lincoln to pay the loans Lincoln had taken to make the loan. However, Dellwood failed to make certain monthly payments to Lincoln and checks from Dellwood to Lincoln were returned by the bank for insufficient funds. Apparently, Dellwood also began to fall behind in its performance of the contracts. As a result, Lincoln became [*2]concerned that defaults under the subject construction contracts would be declared and it would not receive repayment of the loan.
In 2007, as a result of the foregoing concerns, Lincoln asked Dellwood to memorialize the loan in writing. In 2007, Dellwood executed a promissory note, dated May 3, 2007, in the sum of $4,454,241, which provided for interest at 15% per annum. The promissory note represented all amounts Dellwood owed to Lincoln as of the date of the promissory note. The promissory note was signed by Ovad Porat on behalf of Dellwood. Porat's signature on the note was notarized by Attorney Elias Fillas. In addition, Dellwood also signed a confession of judgment and assignment agreement. Both Lincoln and Dellwood were represented by counsel with respect to the promissory note and related documents. The promissory note was due and payable to Lincoln upon the sale of the business or shares or interests of Dellwood. Delengos was aware, or should have been aware of the promissory note, by early 2008. Lincoln orally demanded payment of the note, and demanded payment of the promissory note in writing, on November 28, 2012.
On October 31, 2007, Porat sold his membership interest in Dellwood to Delengos, the individual defendant in action number one. Since that time, Delengos has been the sole member of Dellwood. Delengos was represented by his current counsel, George Coffinas, in the transaction. Delengos testified that at the time he purchased Dellwood, he believed that Dellwood owed Lincoln $3,200,000. By January 2008, Delengos was aware of the promissory note between Dellwood and Lincoln, in the sum of $4,454,241. Delengos went to Lincoln to request that it reduce the amount of money which Dellwood owed to Lincoln. In August 2009, Dellwood made a single payment to Lincoln, in the sum of $150,000, on the promissory note. This represented a partial payment of the promissory note. Other than the one payment of $150,000, Dellwood has not made any other payments to Lincoln on the promissory note, triggering the subject lawsuits.
Delengos contradicted himself on material issues several times during the trial, rendering his testimony unbelievable. At his pretrial deposition, he testified that he first became aware of the promissory note, at the beginning of 2008, when he signed the purchase agreement. At trial, he claimed that he first became aware of the promissory agreement in 2012. The Court finds that this testimony is not credible. The Court finds that Delengos was aware of the promissory note when he acquired Dellwood, or he should have been so aware. Dellwood's tax returns for the years 2010 to 2015 acknowledge a loan payable to Lincoln. During 2013, all of the cash collateral which Lincoln had advanced on behalf of Dellwood remained on deposit. The Court also finds it incredible that Mr. Delengos and his attorney would consummate the purchase of Dellwood without performing due diligence in determining its debt liability to Lincoln.
Moreover, the evidence adduced at trial demonstrated that Delengos appropriated corporate funds from Dellwood to his own personal use. He claimed that he had made loans to Dellwood, however Dellwood's tax returns demonstrate that there were no loans [*3]made by Delengos to Dellwood. On April 6, 2010, Dellwood issued a check to Delengos for $130,000, which Delengos deposited into his personal account. On April 9, 2010, Delengos wrote a check for $130,000 to repay a $150,000 loan. Delengos took a $200,000 corporate loan from a third-party, which he deposited into his personal account, and transferred just $155,000 to Dellwood. In January 2012, Dellwood issued a check to Delengos for $220,000, following which he paid $224,205.96 to someone who had loaned him money. He borrowed $300,000 from another individual, $265,000 of which was distributed to a bonding company to post security for mechanics' liens, and $27,425 of which was dispersed to Delengos personally. Delengos made numerous account-to-account transfers from Dellwood's corporate account to his personal account. Between 2009 and 2014, he transferred $143,200 from Dellwood's bank account to his personal bank account. Between 2007 and 2015, he transferred $1,051,434.53 from Dellwood's bank account to his personal bank account. Between 2007 and 2015, he transferred $606,693.27 from Dellwood's bank account to unidentified recipients. Between 2008 and 2010, he transferred $63,326.72 from Dellwood's bank account to casinos for his personal use. In 2014, he transferred $50,000 from Dellwood's bank account to a personal account in his name in Greece. In 2014, he transferred $37,450 from Dellwood's bank account to an account in Greece, in the name of "Gus Dimitropoulos for the benefit of Demetrios Delengos." Between July 2008 and March 2014, he charged a total of $698,333.94 on Dellwood's corporate American Express credit card. Of that amount $14,844.41 was for automobile expenses, $2099.16 was for charges at casinos, $56,669.13 was for travel and entertainment for himself and his family, and $80,815.32 was for personal expenses. He provided Dellwood's American Express credit card to his brother George. George charged over $295,000 on Dellwood's credit card. These charges included purchases at Macy's, Nordstrom, liquor stores, eye care facilities, and gas stations. Dellwood issued checks to Richard Preiser, Preiser Racing Limited, LLC (Preiser), totaling not less than $594,613.15, from 2009 to 2015. He claimed that these payments were made so that Preiser would prominently identify Dellwood as a sponsor on its race cars. However, Richard Preiser testified that Preiser never put Dellwood's name on any race cars. Preiser's testimony contradicted Delengos' testimony that Preiser provided advertising services for Dellwood. The Court finds defendant's explanations for these payments to be lacking in credibility, and unsupported by documentary evidence.
CONCLUSIONS OF LAW
Breach of Contract
With respect to the first cause of action, the elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance of the contract by the injured party; (3) breach by the other party; and (4) resulting damages (JP Morgan Chase v J.H. Elec. of NY, Inc., 69 AD3d 802 [2d Dept 2010]). 
"To establish prima facie entitlement to judgment as a matter of law with respect to a promissory note, a plaintiff must show the existence of a promissory note, executed by the defendant, containing an unequivocal and unconditional obligation to repay, and the failure by the defendant to pay in accordance with the note's terms" (Ahern v Miloslau, 128 AD3d 992 [2d Dept. 2015]; see Zyskind v FaceCake Mktg. Tech., Inc., 101 AD3d 550, 551 [1st Dept. 2012]; Gullery v Imburgio, 74 AD3d 1022 [2d Dept 2010]). Once the plaintiff submits evidence establishing these elements, the burden shifts to the defendant to submit evidence establishing the existence of a triable issue with respect to a bona fide defense (see Pennsylvania Higher Educ. Assistance Agency v Musheyev, 68 AD3d 736 [2d Dept 2009]).
Here, the plaintiff demonstrated that Delengos purchased Dellwood with knowledge of, and subject to the existing promissory note between Lincoln and his predecessor-in-interest. The express terms of the note provided that payment was due on the sale of the business or shares or interests of the LLC, which took place in October 31, 2007, when Ovad Porat sold Dellwood to Delengos. Based upon the foregoing, the express terms of the note itself provided a triggering event, thereby obviating a demand for payment. Otherwise, the aforementioned provision of the note would be rendered ineffectual and meaningless. Therefore, no notice or demand was required under the terms of the note. Notwithstanding the foregoing, there was credible testimony that several oral demands for payment were made by Lincoln's principal, not to mention that the second action was commenced after written demand for payment had been made.
Moreover, there was a payment of $150,000 made on the subject loan in August, 2009. In an appropriate case, such as this, a court may indeed give effect to an otherwise unenforceable contract where there has been part performance (see General Obligations Law, sec. 5-703 [4]); Flatiron Notebuyer, LLP v. 1141 Realty LLC, 2013 NY Misc. LEXIS 4504, *30, 2013 NY Slip Op 32399(U), 19 [Sup. Ct. NY Co. 2013]).
Thus, based upon the foregoing, the plaintiff satisfactorily established its prima facie case at trial.
In opposition, the defendant's unsupported and contradictory testimony as to when he acquired knowledge of the note, along with the rebuttal testimony that Delengos requested that the plaintiff reduce the amount, failed to overcome the plaintiff's showing that Delengos knew of the existence of the note, and that the plaintiff was entitled to recovery thereunder. 
Accordingly, the plaintiff is entitled to recover on the first two causes of action for breach of contract in action number one, and on the single cause of action for breach of contract in action number two.
Usury
Usury is an affirmative defense, and a heavy burden rests upon the party seeking to impeach a transaction based upon usury (see Hochman v LaRea, 14 AD3d 653, 654; [*4]Gandy Mach. v Pogue, 106 AD2d 684). The maximum per annum interest rate for a loan or forbearance of money is 16%, under New York's civil usury statute, and 25%, under the state's criminal usury statutes (see General Obligations Law § 5-501 [civil usury]; Penal Law §§ 190.40, 190.42 [criminal]). With some exceptions that do not apply here, a corporation may assert criminal usury as a defense where the amount of the loan or forbearance is more than $250,000.00 and less than $2,500,000.00 (see General Obligations Law § 5-521 [3]; Blue Wolf Capital Fund II, L.P. v American Stevedoring Inc., 105 AD3d 178). To successfully raise the defense of usury, a debtor must allege and prove by clear and convincing evidence that a loan or forbearance of money, requiring interest in violation of a usury statute, was charged by the holder or payee with the intent to take interest in excess of the legal rate (see Giventer v Arnow, 37 NY2d 305, 309). Usury must be proved by clear and convincing evidence as to all its elements and usury will not be presumed (see Freitas v Geddes Sav. & Loan Assn., 63 NY2d 254, 261). If usury can be gleaned from the face of an instrument, intent will be implied and usury will be found as a matter of law (see Fareri v Rain's Intl., 187 AD2d 481, 482). Usury must be proved by clear and convincing evidence as to all its elements and usury will not be presumed (see Freitas v Geddes Sav. & Loan Assn., 63 NY2d 254, 261).
It is well settled, however, that where a loan is made to a corporation, the corporation and the individual guarantors of a corporate obligation are prohibited by statute from interposing the defense of usury (see General Obligations Law § 5-521; Schneider v Phelps, 41 NY2d 238; Webar, Inc. v Capra, 212 AD2d 594, 595 [1st Dept. 1995]). An exception to the general rule is recognized, however, " 'where the corporate form is used to conceal a usurious loan to an individual to discharge his personal obligations, and not to further a corporate enterprise' " (Webar, Inc. v Capra, supra, at 595 quoting Sanders & Assocs. v Friedman, 137 AD2d 677; see e.g. Donenfeld v Brilliant Tech. Corp., 2011 NY Misc. LEXIS 934, *11, 2011 NY Slip Op 30554(U), 10 [Sup Ct. NY Co. 2011] ). The applicability of this exception has not been demonstrated.
The subject loan was made to a corporation in an amount excluded from the usury statute. Based upon the foregoing authority, the defense of usury may not be asserted. In any event, the defendant has failed to prove, by clear and convincing evidence at trial, that the subject loan required interest in violation of a usury statute, and was charged by the holder or payee with the intent to take interest in excess of the legal rate. 
In conclusion, the Court finds that the defense of usury is unavailable to defendant Dellwood, and it is liable for the entire amount of the loan, less any sums paid, plus interest, costs and disbursements from the date of the breach.
Piercing the Corporate Veil
Initially, it is beyond cavil that "New York does not recognize a separate cause of action to pierce the corporate veil" (Fiber Consultants, Inc. v Fiber Optek Interconnect Corp., 15 AD3d 528, 529 [2d Dept 2005] lv dismissed 4 NY3d 882 [2005]; see also [*5]DiMauro v United, LLC, 122 AD3d 568 [ 2d Dept. 2014; Fiber Consultants, Inc. v Fiber Optek Interconnect Corp., 15 AD3d 528, 529, 792 NYS2d 89 [2005]; Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 141[1993]). Accordingly, ' [a] plaintiffs attempt to pierce a defendant's corporate veil 'does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its [parent]'" (Cioffi v S.M. Foods, Inc., 129 AD3d 888 [2d Dept 2015] quoting Goel v Ramachandran, 111 AD3d 783, 793 [2d Dept 2013]). The joinder of the corporation is necessary to prosecute a claims for recovery against an individual owner who abused the corporate form under theories of corporate veil piercing (see Mannucci v Missionary Sisters of Sacred Heart of Jesus, 94 AD3d 471 [1st Dept 2012]; Corman v LaFountain, 38 AD3d 706 [2d Dept 2007]), as they shall, upon the successful invocation of the doctrine, be considered as a single personality for purposes of liability (see Aztie, Inc. v Auto Collection, Inc., 124 AD3d 811 [2d Dept 2015]; Solow v Domestic Stolle Erectors, Inc., 229 AD2d 312 [1st Dept 1996]).
Accordingly, the ninth cause of action in the plaintiff's Amended Complaint, in action number one is dismissed. However, the dismissal of the cause of action has no bearing upon the applicability of the remedy, particularly where, as here, it is justified by the facts.
Veil-piercing is a narrowly construed doctrine limiting "the accepted principles that a corporation exists independently of its owners . . . and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners" (Matter of Morris v New York State Dept. of Taxation & Fin.,  supra at 140; see Vivir of L I, Inc. v Ehrenkranz, 145 AD3d 834 [2d Dept. 2016]). The party seeking to pierce the corporate veil bears the heavy burden of "showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" (id. at 141; Sheridan Broadcasting Corp. v Small, 19 AD3d 331, 332 [1st Dept 2005]). Piercing the corporate veil is an equitable concept that allows a claimant or creditor to disregard a corporation and to hold its controlling shareholders personally liable for corporate debts or other liabilities. "Additionally, the corporate veil will be pierced to achieve equity, even absent fraud, when a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego" (Williams v Lovell Safety Mgt. Co., LLC, 71 AD3d 671, 672 [2d Dept. 2010][internal quotation marks omitted]; see DeMartino v 3858, Inc., 114 AD3d 634, 636, 979 NYS2d 648; Campone v Pisciotta Servs., Inc., 87 AD3d 1104, 1105 [2d Dept. 2011]). 
The concept of piercing the corporate veil is an exception to the general rule that a corporation exists independently of its owners who are not personally liable for its [*6]obligations, and that individuals may incorporate for the express purpose of limiting their liability (see generally Bartle v Home Owners Coop., 309 NY 103, 106 [1955]). Where successful invocation of the doctrine of piercing the corporate veil permits, in certain circumstances, the imposition of personal liability on owners for the obligations of their corporation (see Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 140-141 [1993]).
A plaintiff seeking to pierce the corporate veil must demonstrate that a court should intervene because the owners of the corporation exercised complete domination over it in the transaction at issue. Indicia of a situation warranting veil-piercing include: " '(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated  corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own' ". (Peery v United Capital Corp., 84 AD3d 1201, [2d Dept. 2011] quoting Gateway I Group, Inc. v Park Ave. Physicians, P.C., 62 AD3d at 146 [2d Dept. 2009] quoting Shisgal v Brown, 21 AD3d 845, 848-849 [2d Dept. 2005]).
In Matter of Agai v Diontech Consulting, Inc., (138 AD3d 736  [2d Dept. 2016]), the Second Department held that:
Here, the petitioners demonstrated their prima facie entitlement to judgment as a matter of law on so much of the petition as sought to pierce Diontech's corporate veil by submitting evidence showing, inter alia, that the appellants dominated Diontech, that Diontech did not adhere to any corporate formalities such as holding regular meetings and maintaining corporate records and minutes, that the appellants used corporate funds for personal purposes, and that the appellants stripped Diontech of assets as they wound down the business, leaving it without sufficient funds to pay its creditors, including the petitioners (see Ventresca Realty Corp. v Houlihan, 41 AD3d 707, 838 N.Y.S.2d 609; Godwin Realty Assocs. v CATV Enters., 275 AD2d 269, 270, 712 N.Y.S.2d 39; Austin Powder Co. v McCullough, 216 AD2d 825, 827-828, 628 N.Y.S.2d 855). In opposition, the appellants failed to raise a triable issue of fact. The appellants' self-serving affidavits, which contradicted their prior deposition testimony, were insufficient to defeat summary judgment (see Perez v Bronx Park S. Assocs., 285 AD2d 402, 404, 728 N.Y.S.2d 33; Phillips v Bronx Lebanon Hosp., 268 AD2d 318, 701 N.Y.S.2d 403).
The Second Department had previously held, in Pae v Chul Yoon, 41 AD3d 681, 682 [2d Dept. 2007]) that:
Testimony at trial established that the plaintiff and the appellant's corporation entered into a valid agreement for the sale and purchase of goods, and that the appellant, the sole owner of the corporation, dominated the corporation and was solely responsible for the wrongful failure of the corporation to pay the plaintiff. The evidence also revealed the absence of corporate formalities, such as the lack of a distinction between corporate funds and the defendant's personal funds. Therefore, the JHO properly concluded that the appellant was personally liable under the agreement [citations omitted].
Likewise, in the case at bar, there was no evidence of adherence to corporate formalities, such as the maintenance of records documenting the purpose for the cash expenditures that appeared targeted for the personal use and benefit of the individual plaintiff. The evidence was overwhelming that Delengos used corporate funds for personal purposes, and that he stripped the company of all monies in its coffers, leaving it unable to pay its creditors, specifically, the plaintiff at bar. Indeed, the evidence at trial establishes that it is likely, if not certain, that Dellwood, whose assets are $50,000 or less, will be unable to pay any monetary judgment awarded by this Court, since corporate funds were distributed by Delengos for non-corporate purposes. These included transfers, between 2007 and 2015, of $1,051,434.53, from Dellwood's bank account to his personal bank account; transfers, between 2007 and 2015, of $606,693.27, from Dellwood's bank account to unidentified recipients; transfers, between 2008 and 2010, of $63,326.72, from Dellwood's bank account to casinos for his personal benefit; a transfer, in 2014, of $50,000, from Dellwood's bank account to a personal account in his name, in Greece; a transfer, in 2014, of $37,450, from Dellwood's bank account to an account, in Greece, in the name of Gus Dimitropoulos for the benefit of Demetrios Delengos; charges of $698,333.94, between July 2008 and March 2014, on Dellwood's American Express credit card, $14,844.41 of which was for automobile expenses, $2099.16 of which was for charges at casinos, $56,669.13 of which was for travel and entertainment for himself and his family, and $80,815.32 of which was for personal expenses; over $295,000 charged by his brother George to Dellwood's American Express credit card, including purchases at Macy's, Nordstrom, liquor stores, eye care facilities, and gas stations; charges totaling not less than $594,613.15, issued by Dellwood to Preiser Racing Limited, from 2009 to 2015.
Here, the plaintiff has demonstrated, in the opinion of the Court, actions which were calculated to, and which did, prevent the plaintiff from collecting the amount due on the loan by utilizing corporate funds for personal purposes, thereby impoverishing the corporation and rendering it a mere shell. This was far more nefarious than "a simple [*7]breach of contract" (Brainstorms Internet Mktg. v USA Networks, 6 AD3d 318 [1st Dept. 2004]); Bonacasa Realty Co., LLC v Salvatore, 109 AD3d 946, 947 [2d Dept 2013]; Skanska USA Bldg. Inc. v Atlantic Yards B2 Owner, LLC, 40 NYS3d 46, 53-54 [1st Dept. 2016]). The plaintiff here abused the corporate form in order to avoid his creditors.
In Azte Inc. v Auto Collection, Inc., 36 Misc 3d 1238(A), 961 NYS2d 356, 2012 NY Slip Op 51731(U), 12 [Sup Ct. Kings Co. 2012; Demarest, J.] ), Justice Demarest, after trial, pierced the corporate veil as to one of the individual defendants, finding that:
Based upon the testimony and exhibits introduced at trial, it is clear that Steven exercised  complete domination and control of the Auto Collection, including the transactions at issue in this action, commingled the Auto Collection's funds with his personal funds and that of another unrelated corporation, Platinum Volkswagen, owned by Steven, and that Steven's domination resulted in significant damages to the plaintiffs in that insufficient funds remain in the Auto Collection to satisfy plaintiffs' judgments...Steven commingled the Auto Collection's funds with his personal funds and used corporate assets for his personal benefit. Plaintiffs introduced substantial evidence that Steven wrote checks from the Auto Collection to himself, on multiple occasions, totaling $340,000. Although Steven described these payments as either a repayment of a loan, or used to pay the Auto Collection's expenses, the evidence established that substantial portions of these funds were actually used to pay for Steven's new business entity, Platinum Volkswagen, or for other personal purposes.
Similarly, in the case at bar, Delengos commingled funds, issued checks to himself for millions of dollars, permitted his brother use of the corporate credit card for personal purchases, paid gambling and personal debts with the corporation's money. As a result, the corporation is likely unable to satisfy the subject loan (see also Webmediabrands, Inc. v Latinvision, Inc., 46 Misc 3d 929, 933 [ Sup. Ct. 2014; Friedman, J.] [evidence of commingling of funds strongly supported plaintiffs' veil piercing claim]).
Accordingly, Delengos "abused the privilege of doing business in the corporate form to perpetrate a wrong" and thus it is appropriate for this court to intervene in equity and pierce the corporate veil (Morris v State Dep't of Taxation & Fin., 82 NY2d 135 [1993]). The corporate veil is pierced as to Delengos, and he is jointly and severally liable for any judgment in this matter entered by this Court (see Webmediabrands, Inc. v Latinvision, Inc., supra).
Fraud
"A cause of action to recover damages for fraud requires allegations of (1) a false representation of fact, (2) knowledge of falsity, (3) intent to induce reliance, (4) justifiable reliance, and (5) damages" (Greenberg v Blake, 117 AD3d 683 [1st Dept [*8]2014] quoting Stein v Doukas, 98 AD3d 1024, 1025 [2d Dept 20I2]). Similarly, the elements of a cause of action sounding in fraudulent inducement are "'representation of a material existing fact, falsity, scienter, deception and injury'" (Dalessio v Kressler, 6 AD3d 57, 61 [2d Dept. 2004] quoting Channel Master Corp. v Aluminum Ltd. Sales, 4 NY2d 403, 407 [1958]). In a fraudulent inducement claim, the alleged misrepresentation should be one of then-present fact, which would be extraneous to the contract and involve a duty separate from or in addition to that imposed by the contract (see Deerfield Communications Corp. v Chesebrough-Ponds, Inc., 68 NY2d 954 [1986]), and not merely a misrepresented intent to perform (see Hawthorne Group, LLC v RRE Ventures, 7 AD3d 320, 323-324 [1st Dept. 2004]). A cause of action to recover damages for fraud will not lie where the only fraud claimed arises from the breach of a contract (see Gorman v Fowkes, 9l AD3d 726,727 [2d Dept. 2012] citing Selinger Enters., Inc. v Cassuto, 50 AD3d 766,768 [2d Dept. 2008]; Tiffiny at Westbury Condominium v Marelli Dev. Corp.,40 AD3d 1073, 1077 [2d Dept. 2007]). A mere misrepresentation of an intent to perform under the contract is insufficient to sustain a cause of action to recover damages for fraud (see Gorman v Fowkes, supra). Here, the fraud cause of action concerns performance under the contract and hence is duplicative of the breach of contract claim (see Hawthorne Group v RRE Ventures, 7 AD3d at 324), and the tenth cause of action must be dismissed.
Quantum Meruit and Implied in Fact Contract
"The criteria for recovery under a theory of unjust enrichment are: ' (1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable  value of the services'" (205 W. 19th St. Corp. v Plymouth Mgt. Group, Inc., 2010 NY Misc. LEXIS 6899, *21-22, 2010 NY Slip Op 33870(U), 12 [Sup Ct. NY Co.2010; Sherwood, J.] quoting Joan Hansen & Co. v Everlast World's Boxing Headquarters Corp., 296 AD2d 103, 108 [1st Dept 2002] quoting Moors v Hall, 143 AD2d 336, 337-338 [2d Dept 1988]). The existence of a valid contract claim bars a cause of action in quantum meruit (see e.g. Sheiffer v Shenkman Capital Mgt., 291 AD2d 295 [1st Dept. 2002]).  The evidence at trial supported the existence of a valid promissory note. Accordingly, the sixth cause of action for quantum meruit must be dismissed.
"A contract implied in fact rests upon the conduct of the parties" (Deerkoski v East 49th St. Dev. II, LLC, 120 AD3d 1387, 1389 [2d Dept. 2014] quoting Watts v Columbia Artists Mgt., 188 AD2d 799, 801 [3d Dept. 1992]). Since the plaintiff proved the existence of an express contract between the parties, the plaintiff's fifth cause of action for implied in fact contract must be dismissed.
Unjust Enrichment
"The essential inquiry in any action for unjust enrichment . . . is whether it is [*9]against equity and good conscience to permit the defendant to retain what is sought to be recovered" Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 182, 944 N.E.2d 1104, 1110, 919 NYS2d 465, 471, 2011 NY LEXIS 114, *13, 2011 NY Slip Op 741, 6 (NY 2011); Mandarin Trading Ltd. v Wildenstein, supra, quoting Paramount Film Distrib. Corp. v State of New York, 30 NY2d 415, 421 119721). A plaintiff must show "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered " (Citibank, N.A. v Walker, 12 AD3d 480, 481 [2d Dept 2004] [internal quotation marks removed]).
Plaintiffs' unjust enrichment claim is duplicative of the plaintiff's contract claim, and hence, the plaintiff's fourth cause of action must be dismissed.
Implied Duty of Good Faith and Fair Dealing
Plaintiff's claim premised on the implied duty of good faith and fair dealing also fails as duplicative of the breach of contract claim. It is well-settled that, when an implied covenant claim arises from the same facts and seeks the same damages as an express breach of contract claim, the implied covenant claim fails (see Havell Capital Enhanced Mun. Income Fund, L.P. v Citibank, N.A., 84 AD3d 588, 588 [1st Dept 2011]) [affirming dismissal of breach of the implied covenant of good faith and fair dealing claim that "arose from the same facts and sought identical damages, [and] was duplicative of the contract claim"]); 2470 Cadillas Resources, Inc. v DHL Express (USA), Inc., 84 AD3d 697, 698 [1st Dept 2011] ["The third cause of action, for breach of the implied covenant of good faith and fair dealing, is duplicative of the breach of contract cause of action since it is based on the same facts as are alleged in support of that cause of action"]); see also TeeVee Toons, Inc. v Prudential Sec. Credit Corp., L.L.C., 8 AD3d 134, 134 [1st Dept. 2004] [affirming dismissal of claim for breach of the implied covenant of good faith because it was "redundant" of breach of contract claim]).
Here, the plaintiff alleges that the defendants breached the implied covenant of good faith and fair dealing based on their alleged failure to pay the promissory note. These are the same allegations that support plaintiffs breach of contract claim. Accordingly, the plaintiff fails to state an independent implied covenant claim, and the seventh cause of action must be dismissed.
Conversion
Plaintiff's cause of action for conversion is barred because it simply repackages his allegations of breach of contract. A claim for conversion cannot be based upon a mere alleged breach of a contractual obligation. "For a cause of action in conversion to lie, the duty breached must spring from circumstances extraneous to the contract; wrongfully withholding money pursuant to a contractual relationship constitutes a breach of the contractual relationship, not conversion." (Kante v All Taxi, 28 Misc 3d 133[A] at *2 (2d [*10]Dept 2010); see e.g. CDR Creances S.A. v Euro-American Lodging Corp., 40 AD3d 421, 422 (1st Dept 2007) (dismissing conversion claim as duplicative of breach of contract claim).
Accordingly, because the factual allegations underpinning the plaintiff's conversion claim - that he is entitled to collection of monies under the promissory note - are no different than those for his breach of contract claim, the plaintiff's conversion claim fails, and the eighth cause of action must be dismissed.
Costs and Attorneys' Fees
Under the general rule, legal fees and disbursements are incidents of litigation, and the prevailing party may not collect them from the unsuccessful party unless an award is authorized by agreement between the parties, statute, or court rule (see Blair v O'Donnell, 85 AD3d 954, 956 [2d Dept. 2011]; Matter of A.G. Ship Maintenance Corp. v Lezak, 69 NY2d 1, 5 [1986]).
The subject debt obligations contain language providing for the payment of attorneys' fees upon default, as follows:
Upon default, the holder of this Note may employ an attorney to enforce the holder's rights and remedies and the maker, principal, surety, guarantor and endorsers of this Note hereby agree to pay to the holder reasonable attorney's fees plus all other reasonable expenses incurred by the holder exercising any of the holder's rights and remedies upon default.
Having sued and recovered upon Dellwood's default in this action, the plaintiff is entitled to attorneys' fees in this action in an amount to be determined by the Court. In order to permit both sides to be heard on this component of damages, the plaintiff shall submit to the Court, and serve upon all of the defendants, within thirty (30) days following service of a copy of this Order with Notice of Entry, an affirmation of legal services; the defendants shall have thirty (30) days thereafter to submit an affirmation in opposition to the plaintiff's affirmation showing cause as to why the plaintiff should not be entitled to recover its attorneys' fees in this matter.
CONCLUSION
The testimony demonstrated that, until 2014, defendant Dellwood had millions of dollars, including, of course, the $2.5 million that Lincoln loaned it, so that it could reap the rewards of the lucrative construction contracts it sought. Between 2008 and 2014, Dellwood had gross assets of $24 million. Delengos testified at trial that, at the time of trial, Dellwood had less than $50,000 in assets. Thus, it could not even return the cash collateral that it had borrowed from the plaintiff. Delengos' explanations were plainly dishonest, and defied logic and reason. He obviously diverted corporate monies in order to render the corporation insolvent and judgment-proof. There is no doubt in the Court's [*11]mind that millions of dollars which were loaned by the plaintiff were diverted to the individual defendant for his and his family members' personal use, which included purchases from local stores, casino debts, as well as investments in automobiles and racing cars. The Court has rarely seen a more poignant example of abuse of the corporate form. Thus, justice requires that Mr. Delengos be held personally responsible for the subject debt, in its full amount.
Accordingly, based upon the foregoing, it is,
ORDERED, that the plaintiff is entitled to recover on its first and second causes of action (in action number one), under Index No. 5899/12, and the first cause of action (in action number two), under Index No. 705630/15, against the corporate defendant Dellwood Development, Ltd. and/or the individual defendant Demetrios Delengos, jointly and/or severally, in the total sum of $4,454,241, plus interest from May 30, 2007, at 15% per annum; less $150,000 paid by defendant Dellwood, in August 2009; and it is further
ORDERED, that the plaintiff's fourth through tenth causes of action, in action number one, under Index No. 5899/12, are dismissed; and it is further
ORDERED, that the plaintiff shall submit to the Court, and serve upon all of the defendants, within thirty (30) days following service of a copy of this Order with Notice of Entry, an affirmation of legal services; the defendants shall have thirty (30) days thereafter to submit an affirmation in opposition to the plaintiff's affirmation showing cause as to why the plaintiff should not be entitled to recover its attorneys' fees in this matter; following which this Court shall issue a judgment on the plaintiff's third cause of action for attorneys' fees.
This constitutes the decision and order of the Court.
Dated: February 23, 2017
TIMOTHY J. DUFFICY, J.S.C.